Argued March 16; affirmed April 12, 1949

# STATE *v.* DOWNING
205 P. 2d 141

D. R. *Dimick*, of Roseburg, argued the cause for appellant. On the brief were Winston, Wayman & Dimick, of Roseburg.

H. A. *Canaday*, District Attorney for Douglas County, Oregon, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, KELLY and BAILEY, Justices.

BRAND, J.

The charging part of the indictment reads as follows:

"The said - - - Corbett Downing and Dale Zitek
- - - - - on the 23rd day of - - August - - A. D. 1947,

in the said County of Douglas and State of Oregon, then and there being and at the same time and place acting together and not being armed with a dangerous weapon, did assault and beat one John Pollard, and did then and there feloniously take and steal from the person of the said John Pollard, one Waltham watch, one small pocket knife and one bill fold containing approximately Eighty-five ($85.00) Dollars in currency, being four Twenty ($20.00) Dollar bills; one Five ($5.00) Dollar bill, and some small change; all said money being lawful money of the United States of America; and all of said personal property then and there being the property of the said John Pollard, - - -''

■ The defendant entered a plea of ''not guilty'', was tried separately and convicted. There are only three assignments of error. The first two may be considered together. By these assignments the defendant asserts that the court erred in refusing to grant defendant's motion for a directed verdict at the close of the State's case on the ground that there was no evidence of any plan on the part of the defendant relating to the assault and robbery. Defendant also asserts that the court erred in refusing to grant a like motion at the close of the defendant's case upon the ground that no evidence of complicity had been produced in said cause. It is not contended by the state that the defendant personally assaulted or beat the victim Pollard. The physical act was performed by the defendant Zitek, but under our statute, if a defendant is concerned in the commission of a crime, whether he directly commits the act constituting the crime, or aids and abets in its commission, he is to be tried and punished as a principal. O. C. L. A., § 23-202.

We have read all of the testimony and find that the

evidence of guilt was both substantial and convincing. We shall summarize only a portion of the evidence tending to establish guilt, Much of it is uncontradicted. Since in the pending case Downing was tried alone, we shall refer to him as the defendant and shall refer to his co-defendant as Zitek.

The scene of the alleged crime was in or near the city of Roseburg, Douglas County, Oregon. On the evening of Saturday, August 23, 1947, the defendant and Zitek met John Pollard on the street. The defendant had known Pollard for two or three months. Zitek and Pollard had never met. The two boys got into Pollard's car with his permission. Pollard bought four quarts of beer. As they drove about, the defendant asked, and was granted permission to drive the car. He also asked Pollard if they could stay all night with him. The defendant then drove out some distance to see a girl, stayed half an hour, then drove to a point back of the fair grounds. The defendant stopped the car and shut off the lights. In answer to Pollard's question, "What did you come down here for?" the defendant answered, "To drink our beer." Immediately thereafter, the defendant started up the car and drove back to the place where they expected to meet the girl friend. They waited there until the girl, together with a truck driver and his wife, arrived. (The defendant Corbett Downing is frequently referred to in the testimony as "Corby"). Pollard testified that as the truck driver, with his wife and the girl drove up,

> "he drove right up pretty close in front of our car, and the truck is pretty high and the lights shined and Corby said, 'Duck down and don't let him see us.' Corby said, 'Duck down so they can't see us - - so the truck driver can't see us.' So we

dropped down and the truck driver got out and went in the house and Dale was trying to get the girl, to take the girl home, and so the truck driver wouldn't let him take her home."

The boys then drove the car to the place where the girl lived. Shortly thereafter she arrived at her home, being driven by the truck driver. Zitek again tried to persuade her to come with him, but without success. Defendant then drove the car back to Pollard's place and again asked if they could stay all night with him. Pollard refused. At this point we quote the testimony of Pollard:

"So Corby said, 'Then we will go down to the river and take a leak.' So down to the river we went and so as soon as we got down there, Corby, he turned the lights out on the car and it was real dark and so as soon as I opened the door to get out, why Dale, he hit me on the back of the head with a quart of beer and I fell over and he stomped me in the stomach and so, in the meantime, Corby had got out on the other side too and he was some distance back of the car by that time."

The defendant himself gave the following account of events at that place:

"And we parked there and Dale then asked him again if we could stay all night and Johnny said, 'No, it was pretty late and better not.' And I said, 'Well, we still had two quarts of beer then.—and I said, 'We better go down to the river and finish drinking our beer so we won't get caught uptown for drinking beer.' and he said, 'All right' and Dale agreed to it and we drove down to the river and I parked there by Mosher Street and turned off the lights and got out of the car to relieve myself and I guess I got eight or ten feet from the car where there was some bushes and I heard some commotion

on the other side of the car and I turned around and started coming back. When I got around the car, Dale was stepping over Johnny—Johnny was laying right straight from the car and he was stepping over and he kept on—well, at first he was walking and then he started running   *   *   *''

Pollard testified that after he was knocked down he was unable to arise. The defendant and Zitek went off from the scene of the crime together, "walking and talking". Pollard lay beside the car for some time and then the defendant came back and said: "Johnny, what's the matter   *   *   *   are you hurt?" Pollard testified that, "he picked me up and put me in the car and in the meantime he was saying, 'I will get the son-of-a-bitch—I will get him for you.' " The defendant's testimony concerning this circumstance closely resembles that of Pollard. The defendant then drove back to Pollard's home and took him up to the house, parked the car and "beat it". After knocking Pollard down, with the defendant standing within eight or ten feet of the car, Zitek took Pollard's purse containing something more than $85, his watch and his knife. Pollard went to the hospital on Sunday, the 24th of August and was released on the succeeding Wednesday. He went to the scene of the crime and found his empty purse and his Eagles pin lying in the grass. On Saturday, one week after the commission of the crime, the defendant came to see Pollard and said that he was "sorry it happened".

Three witnesses, state police officer Morris, city police officer Upham and county juvenile officer, Agnes Pitchford, all testified concerning statements made by the defendant and by Zitek, who were examined separately. The three witnesses were in substantial

agreement as to the statements made. We quote from the testimony of officer Morris:

"A We brought them to court and following which time we asked them about this assault and robbery and they freely admitted at that time what transpired, probably almost word for word with what Mr. Pollard said this morning on the witness stand concerning the incident and also where the watch and knife could be found out at the Downing property. I went out there—Officer Upham and myself—and found the watch and knife hidden under the bedcovers in a tenthouse which both acknowledged that were sleeping quarters for Zitek, and Downing, and brought them back; they both freely admitted what they did on the night of the 23rd assault Mr. Pollard. Ziteck, as I recall, admitted slugging Mr. Pollard and after he went down, he took the purse off of him and Downing admitted that he accepted the purse and took the money out of the purse which he recalled there was four twenties and one five and some miscellaneous change and a dollar bill or so. And Downing also at that time made the statement that Ziteck took the watch and knife off of Mr. Pollard and kept it in his possession and, according to Downing and Ziteck, that on a pre-arranged plan, agreed to meet at the Greyhound Bus Depot and divide the money, which they acknowledged they did. They divided the four twenties equally and the five spot, they had it changed and split that equally also and that is about all I can tell you about it.

"Q Did the defendant, Downing, make those statements to you that you have just mentioned in your testimony—this defendant, did he make those statements to you? Yes, he admitted it."

Witness Morris testified that the defendant and Zitek told "almost identically the same story". Again we quote from the testimony.

"A At the time that we questioned them in

there, they did state that on the way down there, Corbett stated that Ziteck had remarked to him 'Shall we roll him?' and Corbett agreed to it, according to Corbett's own statement.

"* * * :

"Q  Then, you understood that he admitted that he was present at this time when this took place.

"A  He admitted that he was present at the time it took place and he admitted taking the money that was handed to him by Ziteck.

"Q  The defendant did not specifically say that he received any money?

"A  Yes, he did; he did; he did say that.

"Q  Where did he say he received it?

"A  He received it there at the time following the assault when Ziteck handed the purse to Downing, the defendant."

The watch and the knife were identified by the officers and by Pollard. The defendant and Zitek told the officers that the watch was in the tenthouse in which the two boys were living and the officers found the watch hidden in the bedclothes in the tent which the two boys admitted to be their sleeping quarters.

If, as we doubt, more evidence was necessary to carry the case to the jury, it may be found in the testimony of the defendant himself. On the night of the robbery the defendant and Zitek spent the night together at the Rose Hotel in Roseburg. The defendant denied that the money was divided between himself and Zitek. He testified:

"Q  Now, Corbett, actually was any of that money divided between you—was any of that money divided between you?

"A  No, sir, but I thought that I was just as guilty as he was.

"Q Why did you think that? A. Because he spent money on me and gave me money to buy things with."

Again the defendant testified:

"Q Now, on the way from Johnny's house down to the place where this occurred, do you recall any statement having been made to you by Mr. Ziteck in regard to rolling John Pollard?

"A I may have made that statement but I don't know. I told them, as I told Mr. Morris, I guessed I was as guilty as Dale.

"Q Was such a statement ever made on the way down there?

"A No, sir, not as far as I remember.

"Q Do you think you made such a statement to Mr. Morris?

"A Yes, sir, I may have.

"" *   *   *

"Q Did you make a statement that, in the presence of Mr. Sherman Morris and Mr. Upham and Miss Pitchford, he had handed you some money out of the wallet at the time this was supposed to have occurred?

"A Yes, sir, I made a statement of Dale handing me some money.

"Q Why did you make such a statement?

"A Because he had handed me money, I suppose, I guess.

"Q You didn't mean he handed you money at that time?

"A No, sir; I meant I spent half of it because he spent money on me."

There is no occasion for any discussion of the cases cited by the defendant. We agree that it was incumbent upon the state to prove a taking of the goods animo furandi. It was also necessary to prove that he

aided and abetted Zitek in the commission of the crime with criminal intent, but such intent could properly have been inferred by the jury from the acts and conduct of the defendant. There was both prospective and retrospective evidence of common design. The defendant was knowingly in joint possession of the watch, according to his own testimony. He knew it was in his tent and had seen it on the dresser. As said in *State v. Keelen*, 103 Or. 172, 203 P. 306, 204 P. 162, 204 P. 164:

> "In the trial upon a charge of larceny, evidence that recently stolen property was found in the possession of the defendant is circumstantial evidence to be considered by the jury with the other facts in evidence in the case in determining whether defendant is the person who stole the property described in the indictment; 2 Bishop's New Criminal Procedure, § 739. The jury, though they are not bound to do so, may infer from such evidence, considered with all the other facts in evidence in the case, that the accused is the person who stole the property, and whether the jury will in a particular case draw such an inference from the evidence depends upon the character of the property, the nature of the possession and its proximity in time with the theft; State v. Poneroy, 30 Or. 16, 25 (46 Pac. 797)."

In that case it was also held that the defendant's possession of stolen property was an item of evidence to be considered by the jury with the other evidence in the case in determining whether the defendant did aid and abet another in the commission of the crime. In the case at bar we hold that there was substantial evidence in support of every material allegation of the indictment and element of the crime charged.

■ The only other assignment of error is to the effect that the court failed to instruct the jury that an essen-

tial element of the case was a felonious taking and stealing of property and that it failed to define the term "feloniously". No request was made by the defendant for any such instruction. The court instructed the jury that the defendant was charged with the felonious taking and stealing from the person of John Pollard. He instructed that the state must prove all of the material allegations of the indictment by proof beyond reasonable doubt, and told the jury that the following, among others, were the material allegations of the indictment: That the defendant and Zitek were acting together and that they so acting, assaulted and beat Pollard, and that they took and stole the watch, money and knife. The court also instructed as follows:

"Now, the laws of the State of Oregon provide that all persons concerned in the commission of a crime, whether they directly commit the acts constituting the crime or aid and abet in its commission, are principals in any crime so committed, if the crime was committed. For one person to abet another in the commission of a crime, he must knowingly and with criminal intent, aid, promote and encourage or instigate, by act or counsel, or by act and counsel, the commission of the crime. * * *"

That felonious intent is an element of the crime charged is of course true, but it is held that:

"The omission from an instruction of the words 'felonious' or 'fraudulent' is not a fatal defect, if words of equivalent meaning are used or if the elements of a felonious intent are otherwise sufficiently expressed. The use of the word 'steal' in an instruction has been held to import sufficiently a felonious intent." 52 C. J. S., Larceny, § 150, p. 998.

"* * * Under the statute of larceny of domestic animals, it will be noted that the word

'steal' is used. When the word 'steal' is used it means to take and carry away property of another with the felonious intent to deprive the owner thereof, and to appropriate the same to one's own use. It must be noted that when the word 'steal' is used either in the information or in an instruction, that it carries with it the meaning that the property converted is by felonious intent." *McDaniels v. State,* 77 Okla. Criminal Reports 84, 139 P. (2d) 191.

■ During the argument before this court attention was called to the fact that the officers testified concerning certain admissions and a confession of Zitek. The testimony of the officers as to statements made by Zitek to them was pure hearsay, but it was received without objection; no exception was taken, no request for an instruction made and no assignment of error has been presented on that point. The testimony showed substantial agreement between the statements made by the defendant and Zitek, except that there was a disagreement between them as to which one first suggested that they should "roll" the victim. Under the circumstances, the fact that hearsay evidence was received did not prevent the defendant from having a fair trial, and certainly no question concerning that matter has been presented to this court for decision. We find no reversible error and the judgment of conviction is therefore affirmed.